IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION


JEREMY HAYES MUNDINE, #1131861          §


VS.                                     §               CIVIL ACTION NO. 4:07cv489


DIRECTOR, TDCJ-CID                      §


REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Petitioner Jeremy Hayes Mundine, an inmate confined in the Texas prison system, filed this *pro se in forma pauperis* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was referred for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Background

Petitioner is complaining about his Grayson County conviction for aggravated sexual assault and aggravated kidnapping. Cause Numbers 49004, 49003, *The State of Texas v. Jeremy Hayes Mundine*. After pleading "not guilty," he entered plea of "true" to five enhancement convictions – three convictions for possession of a controlled substance, one conviction for aggravated assault on a police officer, and one conviction for aggravated assault. On October 17, 2002, a jury found him guilty, and on October 21, 2002, it sentenced him to two (2) fifty (50) year sentences. On March 9, 2004, the Fifth Court of Appeals affirmed the convictions and sentences. *Mundine v. State*, slip op. Nos. 05-03-00334-CR, 05-03-00335-CR (Tex. App. – Dallas March 9, 2004, pet's. ref'd)

1

(unpublished).  His petitions for discretionary review (PDRs) were refused on January 26, 2005.

PDR Nos. 574-04, 575-04. He filed applications for state writs of habeas corpus, which were denied

without written order on September 12, 2007.  *Ex parte Mundine*, Application Nos. 30,430-04 & -05,

at 16, page after covers, respectively.  Petitioner filed the present federal petition, alleging numerous

grounds for relief:

1.      A portion of his records have been lost or destroyed;

2.      He is actually innocent;

3.      Trial counsel was ineffective by sleeping through critical trial testimony;

4.      Trial counsel was ineffective by allowing the State to claim a hearsay exception to
        the confrontation clause regarding an extraneous offense;

5.      Trial counsel was ineffective for not conducting DNA testing on the victim's
        clothing;

6.      Trial counsel was ineffective for allowing the State witnesses to give perjured
        testimony;

7.      The prosecutor engaged in misconduct when it relied on perjured testimony;

8.      The trial court erroneously admitted extraneous offense testimony; and

9.      The evidence is legally and factually insufficient to support his convictions.

The Government filed a Response, asserting that Petitioner's issues are without merit.  Petitioner

filed a Reply to the Government's Response.

Statement of the Case

The Government, in its Response, summarized the Statement of the Facts based on citations

to the record (citations omitted herein):

Ms. Mason, the State's first witness, testified that she knew Petitioner when she "used to work with . . . [him] at Shady Oaks Nursing Home.  On January 27th, she had some friends over to have a few drinks and play some games.  Petitioner arrived at her house at approximately 1:30-2:00a.m., practically beating the door down.  He had been drinking.  Petitioner was looking for Ms. Mason's daughter, Tracy.  She was not there.  Petitioner continued drinking, and told others to get his cooler, which contained liquor.  At some point during the night, Petitioner became angry and pulled out a gun.  However, Ms. Mason told him to put it away, and he did.  Thereafter, he took a nap, awaiting Tracy's arrival.  When he woke up, he was lying on the bed with Ms. Mason's brother-in-law,  Charles Ray Mason.  After calling him a "Nigger," and telling him that he will be the first one that he shoots,  he cocked the gun and put it up to Mr. Mason's head and pulled the trigger.  It clicked.  At that moment, there was a knock at the door.  It was Jessica Carter and her friend. Petitioner asked, "[w]ho is this bitch," to which Mr. Mason responded, "Jeremy, you don't know her . . ."  And he hit her with the gun upside the head and she went to the floor.  Carter's friend took off running and Petitioner shot at him, but missed, and the bullet hit a wall inside of the house. Thereafter, Petitioner began hitting everyone in the house, forcing them down on their knees, and taking their money.  Then he returned to Mr. Mason, put the gun to his head and pulled the trigger two more times – the gun still did not fire.  At this point, several people in the house took advantage of the opportunity to flee from the house.  Later, Ms. Mason called 911, and when the police arrived, she gave a statement.  Carter was not at the house when the police arrived.  Ms. Mason gave Petitioner's cooler to the police.  Two weeks after the commission of the offenses, Petitioner tried to bribe Ms. Mason to drop all of the charges against him.  He also threatened to pay someone to kill her if she refused his bribe.

Charles Ray Mason, Ms. Mason's brother-in-law, testified next for the State.  He listed the people in the house on the night of the offense.  He identified Petitioner.  He testified that Petitioner pulled a pistol on him on the night of the offenses.  He confirmed that Petitioner put the gun to his head and pulled the trigger, but the gun failed to discharge.  He testified that Petitioner hit him in the head with the gun; that Petitioner hit Taylor in the head with the gun; that Petitioner hit Floyd in the head with the gun; that Petitioner hit Carter and knocked her to the floor; that he took money from other people in the house; and, that he beat Carter until she involuntarily left in the car with him.  Mr. Mason also gave a statement to the police.  He confirmed Petitioner's attempted bribery of Ms. Mason to keep her from testifying.

Tracey Williams, Ms. Mason's daughter also testified.  She confirmed that Petitioner offered her mother a bribe not to testify.

Anthony Taylor testified that he was at Ms. Mason's home on January 27th.  When he arrived, Petitioner had everyone get down on their knees on the floor.  Petitioner told everyone to empty their pockets; Petitioner hit Taylor in the head with his gun; Taylor confirmed that Petitioner slapped Carter to the floor, and that when Petitioner left the house, he forced Carter to go with him.  Taylor confirmed that Petitioner clicked the trigger of his gun twice while pointing it at "this guy's head."

Mary Holland testified to her criminal history – a couple of theft convictions – before she described the night of January 27th at Ms. Mason's home.  She listed the people who were in the house; she identified Petitioner; she confirmed that Petitioner asked someone to get his cooler and bring it in the house; that when Petitioner arrived at the house, he almost kicked the door in; that he hit several people in the head with his gun; that Carter was hit so hard that she fell to the floor; that he took money from the occupants of the house; that people ran from the house during the incident;

4

that Petitioner took Carter with him out of the house; and, that he was telling her that he was going to have sex with her.  Holland identified the car that Carter was forced into, and she saw Carter the next morning acting in a hysterical manner.  She testified that she provided a statement to police.

Lenena Williams, one of Ms. Mason's grandchildren, who was spending the night at the house on the night of the offense, testified next.  She stated that she heard a gun shot during the evening of the incident, but could not see anything because she and the other children were kept in a separate part of Ms. Mason's home.  She also heard a lot of cursing and arguing.  She confirmed that people were told ". . . to put their face in the couch . . .to give their money and stuff."  She believed that the person telling people to do these things was Petitioner.

Carter also testified.  She was 17 years old.  She stopped by Ms. Mason's house with her boyfriend because he wanted to use the restroom.  She encountered Petitioner when she came out of the bathroom.  She testified that there were several people in the house, that Petitioner was acting drunk, striking people on the head with his gun, yelling and demanding money from everyone, that he hit her in the head with his gun then took her money and cigarettes.  He told her to get into his car, and that when she said that she did not want to go with him, he pointed the gun at her and ordered into the car, told her they were going to smoke a lot of dope, and that he would shoot her if she disobeyed his commands.  When she got in his car, ". . . he told me to roll down the window so he can blow my brains out and it won't get all over his car."  Petitioner got into the car, started it, and drove off.  Carter testified that she was upset and crying.  He drove to Herman Baker Park in Grayson County, put the car in park, turned it off, and ". . . he told me to give him head is what he said, I think . . ."  Then he started talking about his wife because I told him that I had a boyfriend and didn't want to [perform oral sex on him].  At one point, he handed the gun to Carter, telling her that

5

she is in control.  She said she was in shock and didn't know what to do.  She did not run or point

the gun at him because she did not know if it was loaded, if he had another gun, or what else might

have been going on.  Next, ". . . he grabbed it away and he hit me and my head hit the window."  He

told her she had to give him head, and she complied.  He had taken his pants and underwear off, and

he made her take off all of her clothing except her shirt.  She then placed his penis in her mouth and

sucked.  He did not have an erection, so he laid his seat back and made her get on top of him.  At this

point, his penis came in contact with her vagina, but he still did could not achieve an erection, so he

made her suck on his penis again and put her finger in his anus.  During this entire episode, he had

his gun on her.  She believed he would kill her if she refused.  When he passed out from intoxication,

Carter was able to escape.  Some Hispanics picked her up and returned her to Ms. Mason's home.

The police were already there.  She gave her statement to the police, told them that Petitioner was

passed out in his car parked at Herman Baker Park.  She did not see anybody else at the park.

     Officer Guedea responded to a dispatch of shots fired in the early morning hours of January

27th.  When he arrived on the scene, several people were moving about on the porch and in the front

yard.  One woman was screaming and yelling, to the point of hyperventilating, that "[h]e shot the

house and took the girl."  Once she was calmed down, she identified Petitioner as the shooter and

kidnaper, and Carter as the abductee.  The hysterical woman was identified as Ms. Mason.  He

testified to and identified photos showing gunshot holes in the Mason house.  Further, he stated that

after the police units had dispersed from the scene, he saw a car occupied by two Hispanics pull up

and a female came out of the back of the car and came directly to his patrol unit.  She ". . . was

visibly upset, crying, screaming."  He got out of his unit and "[s]he said, He's at the park."  Carter

told him her name and that Petitioner was at the park passed out in a car.  Units were immediately

dispatched to the area.

Officer Garbacik, the patrol supervisor at the Mason house, also testified that he was at the Mason house when Carter returned after she escaped from Petitioner. He heard that Petitioner might still be at Herman Baker Park.

Officer Dawsey was also dispatched to a shots-fired-call at the Mason house. He confirmed that Ms. Mason was frantically screaming in front of the house when he and other officers arrived; that Petitioner had fired a gun inside the house; that Petitioner had struck a person in the head with a gun while in the house; and that a white female had been drug out of the house.

Patrolman Kelly testified that he was dispatched to Herman Baker Park. Petitioner was passed out in the driver's seat of the vehicle. A firearm was sitting on the dash on the passenger side of the car. Upon reaching the car, the officer grabbed the handgun from the dash first, through the open passenger window. After Petitioner was awakened by one of the officers, he exited the vehicle with his pants and underwear down around his ankles. Officer Kelly identified the gun as that recovered from Petitioner's car.

Officer Melson was also dispatched to Herman Baker Park. He testified that he was backup; that he was aware that the suspect was armed; and, that he watched the arrest of Petitioner. Officer Cook also assisted as a backup officer at the park. He was approximately 30 feet away from the arrest, and remained at the scene afterward to facilitate the tow truck removal of Petitioner's car. Officer Jones was also dispatched as backup to the park. He approached the driver's side of the vehicle and noticed that Petitioner was reclined in the vehicle. Officer Kelly secured the gun on the dash of the car. Petitioner appeared to be asleep or passed out. Jones called Petitioner's name several times in an attempt to wake him, but then had to shake him to get him to regain

7

consciousness.  Jones confirmed that Petitioner was naked from the waist down, that there was a strong odor of alcohol from his body, that he was sweating profusely, and that there was a used condom about 5-6 feet away from the car.  When Jones mentioned the condom to the other officers and Petitioner, Petitioner said that he didn't use a condom - it wasn't his.  Petitioner was placed in a patrol car and transported to the Grayson County Jail.  His clothes were seized.  Petitioner said that he noticed a red pickup truck at the park and an officer was dispatched to investigate that vehicle. The vehicle was there with two men inside, but they said they had seen nothing.

Detective Atherton testified that he processed Petitioner's vehicle.  He took photographs and instructed Officer Jones to collect Petitioner's clothing.   All of the evidence in the car was photographed.  He then returned to the Mason house to try and recover the bullet fired inside the house by Petitioner.  He found one bullet casing and a bullet fragment there.

Detective Brice Smith testified that he was dispatched to the Mason house on January 27, 2002.  Upon learning that there were several witnesses, he requested assistance.  Detectives Atherton, Bell, and Dunn responded.  Upon arrival at the scene, Officer Garbacvik briefed him on the circumstances.  It was Smith's job to process the evidence at the Mason house.  He saw the bullet hole.  However, soon after arriving at the Mason house, Carter returned.  He interviewed her, noting that she was distraught, shaking, trembling, and visibly upset.  She was taken to the Sherman Police Department where she gave her statement after calming down.  After two hours of taking her statement, Smith ordered scrapings from her fingernails.  He then returned to the Mason house.  He confirmed that he found a spent shell casing, and a bullet.  Various photos of the house and the evidence obtained therefrom were identified and introduced into evidence.  Smith testified to comparing the spent shell casing to live rounds found in Petitioner's gun, and found that they were

the same.  He also ordered ballistic testing on the spent ammunition.

Detective Larry Bell testified next.  He was in the sex crimes division.  He was briefed by Detective Smith prior to meeting with Carter, Ms. Mason, Mr. Mason, and Stevie Williams.  Bell testified to photographs of bloody abrasions on Mr. Mason's head.  He explained that Carter did not go through a rape exam because she stated that Petitioner could not get an erection, and that there was no penetration or ejaculation.  He also stated that her clothing was not seized for the same reasons.  He testified to Petitioner's arrest and his request for physical evidence, including head hair samples, pubic hair samples, a mouth swab, and blood.  Petitioner consented and the collection process was conducted at the Texoma Medical Center in Denison, Texas.  He then testified to the statement that Petitioner provided to him, alleging that he had been a victim of robbery by Carter:

> He told me he went to that house and someone at the house had robbed him of approximately $40 to $60.  This little white girl showed up.  He was mad.  He took the gun that she had, fired it in the air, and gave it back to her and wasn't mad anymore.  He recognized the little white girl had sex for money, so he stated he made a deal with her for sex for money.  Went out to the park and at that point she robbed him of approximately $140 to $160, took his personal properties and left . . . .

> He said apparently she did this after he passed out . . .

> He stated when Jessica came into the house that he knew who she was . . . .

> Later on he stated he recognized, the white girl that has sex for money . . . .

> He stated since he was taking medication and had been drinking heavily, he passed out when they got to the lake . . . .

> He stated that she'd taken his wallet, which contained a driver's license, social security card, red and white cooler, blue and white cooler, a bottle of liquor, and $150 in cash . . . .

> Initially he said the people in the house robbed him of $40 to $60 and later at the park, he said she took $150 from him . . . .

The Detective also testified that he compared Petitioner's story of his losses to the car inventory, and found that all of the property claimed to be stolen by Carter was found in his car.  During direct and cross examination, it was established that Petitioner said that someone had taken his dope when Carter came out of the bathroom.  However, at that time, he never claimed anyone had taken any money as he later did in his statement taken on February 13.  Petitioner was told during the February 13 robbery report that all of the items that he claimed were stolen, were in fact, taken by the police as part of the evidence to be used against him at trial.

Carolyn Ridling performed the sexual assault evidence collection on Petitioner.  She did not collect evidence from Carter because Petitioner had no erection, there was no penetration or ejaculation, and Carter had consumed liquids between the oral copulation and her statement, rendering any opportunity for collection highly unlikely.

Kay Smith, an evidence collection technician, testified to the chain of custody of all of the evidence collected, which was subsequently admitted into evidence at trial.

David Davenport worked at DPS and testified that he found no fingernail scrapings[1] for testing in the envelope.  No other evidence was analyzed because it came from Petitioner only, with nothing from Carter to compare.  Based on all of this evidence, the jury found Petitioner guilty of aggravated kidnaping and aggravated sexual assault of Jessica Carter.

<u>Federal Habeas Corpus Relief</u>

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow.  A person seeking federal habeas corpus review must assert a violation of a

---

[1] The record showed that Carter chewed her fingernails; thus, no evidence was obtained from the scrapings.

federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993). Federal habeas

corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law,

unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-

80, 116 L. Ed.2d 385 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996). In the course

of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard*

*v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further

limited by the Antiterrorism and Effective Death Penalty Act of 1996. The new provisions of

Section 2254(d) provide that an application for a writ of habeas corpus "shall not be granted with

respect to any claim that was adjudicated on the merits in state court proceedings unless the

adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United

States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." *See Williams v. Taylor*, 529 U.S. 362,

402-03, 120 S. Ct. 1495, 1517-18, 146 L. Ed.2d 389 (2000); *Childress v. Johnson*, 103 F.3d 1221,

1224-25 (5th Cir. 1997). The statutory provision requires federal courts to be deferential to habeas

corpus decisions on the merits by state courts. *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it

"applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Williams*, 529 U.S.

at 405-06. A federal court's review of a decision based on the "unreasonable application" test should

only review the "state court's 'decision' and not the written opinion explaining that decision." *Neal*

*v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*). "Under § 2254(d)(1)'s 'unreasonable

application' clause, then, a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.   Rather, that application must be objectively unreasonable.   *Id.* at 409.   The standard is satisfied only if "reasonable jurists considering the question would be of one view that the state court ruling was incorrect."   *Davis v. Johnson*, 158 F.3d 806, 812 (5th Cir 1998) (internal quotation marks and citations omitted).

The trial court's factual findings are entitled to a presumption of correctness unless the petitioner can rebut the presumption with clear and convincing evidence to the contrary. *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001).   A federal district court must be deferential to state court findings supported by the record. *See Pondexter v. Dretke*, 346 F.3d 142, 149-152 (5th Cir. 2003).   A state application that is denied without written order by the Texas Court of Criminal Appeals, as in the present case, is an adjudication on the merits. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits).

<u>Lost or Destroyed Record</u>

Petitioner first asserts that a portion of the statement of facts was lost or destroyed.   He specifically complains about SF pages 24-25 and 32-33.   However, SF pages 25-32 is an exact duplicate of 2 SF 25-32.   The Court Reporter provided those pages, which were attached to the Government's Response.   These pages are not lost or destroyed.

Furthermore, Petitioner asserts that these allegedly missing records are critical.   He contends

that Lena Mason stated facts that Petitioner needs in order to formulate a complete defense based on juror bias and "other preferential treatment." He states that the defect cannot be cured since that portion of the trial is missing.

A review of the "missing" records to which Petitioner refers, shows that Lena Mason said nothing critical during that portion of her testimony. The Statement of Facts containing voir dire is complete; accordingly, Petitioner has shown no constitutional error. This issue is without merit.

### Actual Innocence

Petitioner next claims that he is entitled to relief because he is actually innocent. In *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed.2d 203 (1993), the Supreme Court held that a claim of actual innocence does not state an independent, substantive constitutional claim and was not a basis for federal habeas corpus relief. However, it left open whether a truly persuasive actual innocence claim may establish a constitutional violation sufficient to state a claim for habeas relief. *Id.* at 417. The Fifth Circuit has rejected this possibility and held that claims of actual innocence are not cognizable on federal habeas review. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998). A claim of actual innocence may not be a basis for federal habeas corpus relief absent an independent federal constitutional violation. *Dowthitt*, 230 F.3d at 741. Petitioner has not shown an independent federal constitutional violation. This Court is required to adhere to Fifth Circuit precedent, thus the actual innocence claim is not a cognizable federal habeas claim. This issue should be denied.

### Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective in several instances.

13

Legal Standard

A movant who seeks to overturn his conviction on the grounds of ineffective assistance of counsel must prove his entitlement to relief by a preponderance of the evidence. *James v. Cain*, 56 F.3d 662, 667 (5th Cir. 1995). In order to succeed on a claim of ineffective assistance of counsel, a movant must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 2065, 80 L. Ed.2d 864 (1984). The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. 466 U.S. at 690, 104 S. Ct. at 2066. The right to counsel does not require errorless counsel; instead, a criminal defendant is entitled to reasonably effective assistance. *Boyd v. Estelle*, 661 F.2d 388, 389 (5th Cir. 1981). *See also Rubio v. Estelle*, 689 F.2d 533, 535 (5th Cir. 1982); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984). Secondly, the movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Movant must "affirmatively prove," not just allege, prejudice. *Id.*, 466 U.S. at 693, 104 S. Ct. at 2067. If he fails to prove the prejudice component, the court need not address the question of counsel's performance. *Id.*, 466 U.S. at 697, 104 S. Ct. 2052.

Attorney slept, failed to conduct DNA testing, allowed State witnesses to give perjured testimony

Petitioner asserts that he is entitled to relief because his trial counsel slept during critical parts of the trial, failed to conduct DNA testing on the victim, and allowed the State witnesses to give perjured testimony. In response to the same issues being raised in his state writ of habeas corpus,

14

trial counsel included the following in his affidavit:

> The allegations are patently false.  There was no allegation regarding bodily fluids
> thus no reason to have DNA testing done on any evidence collected by the police.
> I thoroughly investigated the applicant's case prior to the jury trial including
> statement and reports provided by the State.  Although the previous statements by the
> State's witnesses and their testimony at trial were not identical, I made strategic trial
> decisions to only cross-examine on the issues which would help the applicant's case.
> I did not focus on every discrepancy in an effort not to annoy the jury.  I never fell
> asleep in court during the applicant's trial.  The applicant's allegations in that area
> are absolutely false.

*Ex parte Mundine*, Application Nos. 30,430-04 & -05, at 22.  The state habeas court also made

findings of fact concerning this issue:

6.   Jack McGowan was the trial counsel in this case.

7.   There was no allegation regarding bodily fluids; thus, Mr. McGowan had no reason
     to have DNA testing done on any evidence collected by the police.

8.   Mr. McGowan thoroughly investigated the applicant's case prior to the jury trial
     including statements and reports provided by the State.

9.   Mr. McGowan made strategic trial decisions to only cross-examine on the issues that
     would help the applicant's case.

10.  Mr. McGowan did not focus on every discrepancy in an effort not to annoy the jury.

11.  Mr. McGowan never fell asleep in court during the applicant's trial.

*Id*., Application Nos. 30,430-04 & -05, at 25-26.

The state habeas court made findings of fact, with express credibility findings as well.  These

credibility determinations were made by the same judge that presided over Petitioner's criminal trial,

placing the habeas judge in a better position to determine the credibility of witnesses who submitted

affidavits than other courts on direct or collateral review.  *See Buxton v. Lynaugh*, 879 F.2d 140, 146

(5th Cir. 1989).  Petitioner has not rebutted the state habeas court's findings of facts and conclusions of law.  He has not produced an eyewitness to trial counsel sleeping at trial.  He has not produced DNA evidence for testing.  He has not shown that trial counsel allowed any State witness to commit perjury.  Petitioner has also not shown how trial counsel's trial strategy on handling inconsistencies in various testimony was deficient performance.  Strategic choices made after thorough investigation of the law and the facts relevant to plausible options are virtually unchallengeable.  *Strickland*, 466 U.S. at 690; 104 S. Ct. at 2066.  Moreover, a conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.  *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983).  Trial counsel, in this case, filed an affidavit in response to Petitioner's state writs of habeas corpus, explaining his trial strategy.  Additionally, in light of the overwhelming evidence of Petitioner's guilt, it is difficult to imagine an attorney that could have prevailed at the guilt/innocence phase of the trial.  *Wilkerson v. Whitley*, 16 F.3d 64, 68 (5th Cir. 1994) (if facts adduced at trial point to overwhelming to defendant's guilt that even the most competent attorney would be unlikely to have obtained acquittal, defendant's ineffective assistance of counsel claim must fail).

To establish ineffectiveness, a defendant must do more than merely allege a failure to investigate, he must state with specificity what the investigation would have revealed and how it would have altered the outcome of the case.  *United States v. Green*, 882 F.3d 999, 1002 (5th Cir. 1989).  Petitioner's claims are self-serving conclusory allegations, which is insufficient to entitle him to federal habeas relief.  *Smallwood v. Johnson*, 73 F.3d 1343, 1351 (5th Cir. 1996).  In sum, Petitioner has failed to meet the first prong of the *Strickland* standard by showing that his counsel's

16

representation fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065.  He also has failed to show that there is a reasonable probability that, but for counsel's alleged unprofessional errors in failing to object to the prosecutor's closing argument, the result of the proceeding would have been different. *Id*., 466 U.S. at 694; 104 S. Ct. at 2068.  This issue is without merit.  Moreover, Petitioner has failed to show that  the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1517-18; 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25.

Allowed Extraneous Offense Evidence

Petitioner next asserts that his trial counsel was ineffective when he allowed the State, during punishment, to claim a hearsay exception to the confrontation clause as it concerned an extraneous domestic assault by Petitioner against his wife.  However, the record shows that trial counsel objected to this evidence numerous times.  Petitioner has failed to meet the first prong of the *Strickland* standard by showing that his counsel's representation fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065.  He also has failed to show that there is a reasonable probability that, but for counsel's alleged unprofessional errors in failing to object to the prosecutor's closing argument, the result of the proceeding would have been different. *Id*., 466 U.S. at 694; 104 S. Ct. at 2068.  This issue is without merit.

Prosecutorial Misconduct

Petitioner alleges that the prosecutor suborned perjury during the trial.  He bases this

17

allegation on minor inconsistencies with earlier statements. For perjured testimony to rise to the level of a due process violation, a defendant "must show that the prosecution knowingly presented materially false evidence to the jury. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990). Inconsistencies within a witness' testimony, contradictory testimony from various witnesses, and conflicts between reports, written statements and the trial testimony of a prosecution witness do not, standing alone, establish perjury. *Id*.

Petitioner claims that Carter's testimony, that no one was in the park, is perjury. However, just because a police officer's report reflects that a red truck was seen at the park at the time of Petitioner's arrest, does not show perjury by Carter. Petitioner also complains about discrepancies concerning the location of the gun – it was in his hand, but found by police on the dash of the car. Finally, no DNA testing was done based on Petitioner's lack of an erection, failure to penetrate Carter's vagina, and failure to ejaculate. In sum, there is no evidence of perjury related to any of these claims. The state habeas court concluded that Petitioner "has failed to plead or prove any other evidence that the witnesses knowingly made false statement[s] or that the State knowingly used perjured testimony." Petitioner has failed to show that the prosecution knowingly presented materially false evidence to the jury. *Koch,* 907 F.2d at 531. He has also has failed to show that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1517-18; 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25.

18

<u>Trial Court Allowed Extraneous Offense Evidence</u>

Petitioner asserts that the trial court erroneously allowed extraneous offense testimony. Even if erroneous, state evidentiary rulings are not matters for federal habeas review unless they are of such magnitude as to constitute a denial of fundamental fairness under the Due Process Clause. *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992). The evidence in question must be a "crucial, critical, or highly significant factor" in the contest of the entire trial. *Id*. The test to apply is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted. *Rogers v. Lynaugh*, 848 F.2d 606, 609 (5th Cir. 1988).

The Fifth Court of Appeals considered this issue on direct appeal:

In his fourth point of error in the aggravated sexual assault case and his third point of error in the aggravated kidnapping case, Mundine argues he was denied his right to confront and cross- examine witnesses when, during the punishment phase of the cases, the trial court allowed a police officer to testify, over objection, to oral statements made by Mundine's wife to the officer. The State called a police officer to testify about his investigation of a family violence call made by Mundine's wife approximately one year before the offenses for which Mundine was on trial. After the trial court overruled Mundine's objection, the officer testified that Mundine's wife said Mundine had thrown her down on the pavement, got on top of her, and was about to hit her when she scratched his face to get him away from her. The trial court instructed the jury that it could not consider the evidence on the basis of its truth, but could only consider it for the fact that the officer may have relied on the information during the course of his investigation. The jury charge in the punishment phase instructed the jury that it could not consider evidence of extraneous offenses unless it found beyond a reasonable doubt that Mundine committed the offenses.

In non-capital felony cases, the State may present evidence as to any matter the trial court, in the legitimate use of its discretion, deems relevant to sentencing, including evidence of other crimes or bad acts. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2004); *Tracy v. State*, 14 S.W.3d 820, 825 (Tex. App.-Dallas 2000, pet. ref'd). At the punishment hearing, relevant evidence is that which assists the fact finder in determining the appropriate sentence given the particular defendant in the circumstances presented. *See Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999).

19

Admission of hearsay evidence against a criminal defendant implicates the Confrontation Clause of the Sixth Amendment of the United States Constitution because the defendant is not afforded the opportunity to confront the out-of-court declarant. *Guidry v.* State, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999).

Assuming without deciding that the trial court erred in admitting the statements about what Mundine's wife told the officer, we conclude the error, if any, did not contribute to Mundine's punishment. *See Simpson v. State*, 119 S.W.3d 262, 269 (Tex. Crim. App. 2003) ("But we need not decide the issue of the statements' admissibility under the Confrontation Clause because any error in the admission of the statements did not contribute to the appellant's conviction."), *petition for cert. filed*, *available at* http://www.supremecourtus.gov/docket/03-9167.htm (U.S. Feb. 23, 2004). Under the constitutional harm analysis of rule 44.2(a), we must reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a). We consider the entire record in a neutral light and determine "if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *see also Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989); *Montgomery v. State*, 821 S.W.2d 314, 317 (Tex. App.-Dallas 1991), *pet. ref'd*, 827 S.W.2d 324 (Tex. Crim. App. 1992) (en banc).

Other than the statement about the assault on Mundine's wife, the State in its punishment case relied on the evidence of the other offenses committed on the night of Carter's kidnapping and sexual assault, enhancement paragraphs in the indictments for three convictions for possession of a controlled substance, and convictions for aggravated assault of a peace officer and aggravated assault with a deadly weapon, and evidence of other bad acts committed by Mundine. Mundine pled true to the enhancement paragraphs. The State briefly mentioned the assault in closing argument, but did not emphasize the evidence. After reviewing the entire record, we conclude beyond a reasonable doubt that the error, if any, did not contribute to the punishment. *See* Tex. R. App. P. 44.2(a). Having concluded the error is harmless under rule 44.2(a), a more stringent standard, we need not conduct a separate harm analysis under rule 44.2(b). *See Guidry*, 9 S.W.3d at 151 n.14. We overrule Mundine's third point of error in cause number 05-03-00334-CR and his fourth point of error in cause number 05-03-00335-CR. We affirm the trial court's judgments.

*Mundine*, slip op. Nos. 05-03-00334-CR - 335, a *4-6.  The appellate court pointed out that the error

was harmless because the jury was instructed that it could not consider the evidence of extraneous

offenses unless they were proven beyond a reasonable doubt.  The trial court instructed the jury at the time the testimony was given that it could not be considered for the truth of the matter asserted, i.e., that Petitioner actually assaulted his wife.  Jurors are presumed to follow a court's instructions. *Galvan v. Cockrell*, 293 F.3d 760, 765-66 (5th Cir. 2002).  Accordingly, it is presumed that the jury's knowledge of the extraneous offense could not have affected the length of either of his sentences.

Additionally, the appellate court noted all of the extraneous crimes committed at  Ms. Mason's home prior to Carter's abduction.  The record reveals numerous extraneous offenses on the night of Carter's abduction – Petitioner tried to murder Mr. Mason, he assaulted and robbed other guests, he assaulted Carter, and drove drunk to the park.  The record describes the kidnapping and sexual offenses committed against Carter – including sex acts with Petitioner's penis, anus, Carter's mouth, vagina, and finger.  There is evidence of Petitioner pistol-whipping Carter.  Furthermore, Petitioner pleaded true to five enhancement convictions.  Other "bad acts" introduced during the punishment phase included car theft, burglary of a vehicle, driving while intoxicated, public intoxication, threat of assault against friend of Petitioner's wife, theft of beer and cigarettes, threat to rape a clerk, robbery, threat to kill the mother of Petitioner's niece, indecent exposure, assault on jail guards assault on a jail inmate, obstruction of justice and retaliation, impersonating a police officer, aggravated robbery, evading arrest, public intoxication, and another evading arrest and driving while intoxicated. Considering Petitioner's extensive criminal history, the fact that an assault on his wife was mentioned only once during closing arguments, did not materially affect the punishment assessed by the jury.  Petitioner has failed to show that  the state court proceedings resulted in  a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the

21

decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1517-18; 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25.

## Insufficient Evidence

Petitioner finally asserts that the evidence against him was insufficient to sustain his convictions. However, it is well-settled that sufficiency of the evidence is not cognizable in a post-conviction writ of habeas corpus in Texas. *Ex parte Williams*, 703 S.W.2d 674, 677 (Tex. Crim. App. 1986). The Fifth Circuit has also recognized the same state procedural bar. *West v. Johnson*, 92 F.3d 1385, 1398, n. 18 (5th Cir. 1996) (sufficiency of the evidence may be raised on direct appeal, but not in a habeas corpus proceeding). Thus, the claim is procedurally barred unless Petitioner has demonstrated cause and prejudice or a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565, 115 L. Ed.2d 640 (1991). Petitioner has failed to allege or demonstrate cause and prejudice or that he is actually innocent of the crime. Consequently, this claim is procedurally barred from review. He has also failed to show that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03; *Childress*, 103 F.3d at 1224-25.

## Conclusion

In each of his ineffective assistance of trial counsel claims, Petitioner has failed to demonstrate a reasonable probability that the result of the trial would have been different, but for

22

counsel's strategy. *Strickland*, 466 U.S. at 694; 104 S. Ct. at 2068.   Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle*, 502 U.S. at 67-68, 112 S. Ct. 475, 479-80, 116 L. Ed.2d 385 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).   In all of his claims, Petitioner has failed to show that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25.   Accordingly, his petition should be dismissed.

## Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."   28 U.S.C. § 2253(c)(1)(A).   Although Petitioner has not yet filed a notice of appeal, it is respectfully recommended that this Court, nonetheless, address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court.   Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.   28 U.S.C. § 2253(c)(2).   The Supreme Court fully explained

the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed.2d 542 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

It is respectfully recommended that reasonable jurists could not debate the denial of the Petitioner's § 2254 petition on procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 134, 154 L. Ed.2d 931 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is recommended that the Court find that the Petitioner is not entitled to a certificate of appealability as to his claims.

## Recommendation

It is therefore recommended that the petition be dismissed with prejudice. It is further recommended that a certificate of appealability be denied.

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report.

A party's failure to file written objections to the findings, conclusions and recommendations

contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Serv. Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 26th day of February, 2011.**


_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE

25